**Affirmed and Opinion filed August 1, 2017.**



In The

# Fourteenth Court of Appeals

### NO. 14-16-00258-CV

**SUSAN CAMILLE LEE, Appellant**

**V.**

**RONALD E. LEE JR., KATHERINE LEE STACY, AND LEGACY TRUST COMPANY, RECEIVER, Appellees**

**On Appeal from the Probate Court No. 2**
**Harris County, Texas**
**Trial Court Cause No. 137,506-403**

## O P I N I O N

In this dispute between siblings concerning the administration of their mother's testamentary trust, a sister appeals trial court rulings (1) removing her as trustee, (2) appointing a receiver, (3) approving the receiver's application for approval of a settlement agreement with the sister's brother, and (4) denying the sister's motion to continue the hearing on the receiver's application. We conclude that the statutory probate court's orders are not void for lack of jurisdiction, and that the court did not abuse its discretion in approving the settlement agreement or in

denying the motion for a continuance. We accordingly affirm the trial court's judgment.

## I. BACKGROUND

Katherine Pillot Lee Barnhart died in 1975, and under the terms of her will, most of her estate passed into a testamentary trust ("the Trust"). Barnhart's children Ronald E. Lee Jr. ("Ronald") and Susan Camille Lee ("Susan") are beneficiaries of the Trust, as are Ronald's daughter Katherine Lee Stacy ("Stacy") and Susan's daughter Susan Gibson ("Gibson"). The trustee is required to make quarterly distributions of one-sixth of the Trust's current net income to Ronald and one-sixth to Susan. If this amount, together with funds available from other sources, is insufficient to provide for either Ronald's or Susan's health, maintenance, and support, then the Trust must distribute additional amounts to that person from the remaining two-thirds of the Trust's current net income. The remainder of the Trust's current net income must be distributed at least semi-annually to Stacy and Gibson. On the death of Ronald and Susan, the remainder of the Trust estate is to be transferred to new, separate trusts for Stacy and Gibson.

## A. The First Lawsuit: Susan's Suit Against Ronald

Thirteen years after Barnhart's death, Ronald, the executor of his mother's estate and original trustee of the Trust, had made no distributions and had not responded to Susan's repeated demands for an accounting. Susan, individually and on behalf of the Trust, sued Ronald in a statutory probate court for breach of fiduciary duty and asked the trial court to remove him as executor and as trustee.

The jury found that Ronald breached his fiduciary duties to the Trust by expending large amounts on a later-abandoned real estate development project, unreasonable office expenses, and excessive executor's fees. The trial court reduced

2

the amount of the damages assessed by the jury for excessive fees and declined to remove Ronald as executor or trustee. The parties agreed that each side's reasonable and necessary attorney's fees were $1.5 million for attorney's fees through trial, an additional $300,000 in the event of an appeal to an intermediate appellate court, and a further $100,000 in the event of an appeal to the Texas Supreme Court. The trial court ordered the Trust to pay for each side's attorney's fees.

Susan appealed. *See Lee v. Lee*, 47 S.W.3d 767 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (corr. op. on reh'g) ("*Lee I*"). We concluded that the trial court erred in reducing the damages assessed by the jury; in failing to remove Ronald as trustee; and in refusing to require Ronald to reimburse the Trust for Susan's attorney's fees. *See id.* at 801. Although Ronald had paid the judgment rendered by the trial court, the decision in *Lee I* left Ronald owing the Trust—of which Susan was now the trustee—more than $1.5 million as reimbursement for his excessive executor's fees and $1.9 million as reimbursement for Susan's attorney's fees. The parties agree that as of February 28, 2002, pre-and post-judgment interest brought this amount to $6,128,326.99.

## B.    This Lawsuit: Ronald's Suit Against Susan

Fourteen years after Susan became trustee, she too had failed to make any distributions to Ronald or his daughter; however, there is evidence that Susan made distributions to herself and her own daughter. In the summer of 2014, Ronald sued and requested a Trust accounting so he could calculate the extent to which his outstanding debt to the Trust was offset by the Trust's withholding of the required distributions to him. Susan refused to respond. Six months later, Ronald received notice of the impending foreclosure of one of the Trust's real properties for nonpayment of taxes. Susan allowed a default judgment to be taken against the Trust, but redeemed the property before it was sold.

3

Ronald sued Susan, individually and in her capacity as trustee, in the same statutory probate court in which the earlier case was tried. He asserted claims for breach of fiduciary duty, violations of the Trust's terms and of the Texas Trust Code, and asked for an accounting, Susan's removal as trustee, and attorney's fees. Stacy intervened in the action, seeking the same relief on the same grounds.

After finding that Susan had breached the terms of the Trust and of the Texas Trust Code, and that the Trust was at risk of further imminent harm from Susan's failure to pay taxes on Trust real property, the trial court removed Susan as trustee on June 18, 2015 and appointed Legacy Trust Company, N.A. ("Legacy") as the Trust's receiver. The trial court directed Legacy to, among other things, pay Ronald's attorney's fees; "[c]ollect, compromise, or settle all debts owed to the Trust"; "[p]rosecute, defend, and/or settle all legal proceedings . . . brought by or against the Trustee of the Trust"; and "[i]nstitute such legal proceedings as the Receiver deems necessary or advisable to obtain constructive or actual possession of assets of the Trust or to recover damages suffered by the Trust." The trial court also granted the receiver "discretion not to pursue litigation against [Susan] that is undertaken by beneficiaries of the Trust for the benefit of the Trust." The trial court ordered Susan to provide to Legacy, within seven days, copies of all records in her possession, custody, and control sufficient to identify (1) all real and personal property owned by the Trust, or by Susan as trustee, at any time while Susan was trustee; and (2) all of the Trust's distributions and expenditures during that time. Susan did none of these things.

After Susan was removed as trustee, Ronald paid Legacy $8 million toward his debt to the Trust and asked to negotiate a settlement. Legacy informed Susan's attorney Thomas Zabel that it was negotiating a settlement with Ronald. Legacy also attempted to contact Susan directly by phone, email, letter, and finally by having

4

a Legacy employee fly with Zabel to Florida, where Susan resides, but Susan refused to respond.

After months of negotiation, Legacy and Ronald reached a settlement agreement and Legacy filed an application for the trial court's approval. Susan filed a response and objections to the application. A week before the hearing on the application, Susan moved for a continuance of at least ninety days to conduct discovery. At the hearing on both matters, the trial court stated that it would hear the description of the settlement first, and that Susan could move for a continuance afterward if she still believed discovery was needed.

Legacy's president and chief executive officer Edward "Ned" Naumes testified in support of the settlement agreement, as did Ronald. At the close of the evidence on the application for approval of the settlement, the parties presented their arguments on Susan's motion for a continuance to perform discovery. The trial court denied the motion, approved the settlement, and informed counsel that the court would hold another hearing on the application in two weeks if Susan moved for a rehearing. Susan did not do so.

Two days after Susan filed her notice of appeal, Legacy and Ronald closed on the settlement agreement. In accordance with the agreement's terms, Ronald deeded his interest in certain property to Legacy, in its capacity as the Trust's receiver. Ronald also executed and delivered a promissory note and other agreements and made the first payment toward the cash portion of the settlement. In exchange for this and other consideration, Legacy sold to Ronald the Trust's judgment against him.

## II. ISSUES PRESENTED

In her first issue, Susan asserts that the statutory probate court could exercise jurisdiction over the claims and requests raised in this case only if there were a pending probate proceeding. She asserts that there was no pending probate proceeding when the trial court removed her as trustee and appointed a receiver in June 2015, or when the trial court approved Legacy's settlement agreement with Ronald in March 2016. She therefore reasons that these rulings are void for want of jurisdiction. In her second issue, Susan contends that if the trial court had jurisdiction, then the trial court abused its discretion in approving the settlement agreement. She argues in her third issue that the trial court abused its discretion in denying her motion to continue the hearing on Legacy's application for approval of the settlement agreement.

## III. THIS COURT'S JURISDICTION

A judgment or order by a court without the power or jurisdiction to render it is void. *See Urbish v. 127th Judicial Dist. Court*, 708 S.W.2d 429, 431 (Tex. 1986) (orig. proceeding). All courts accordingly are obliged "to ascertain that subject matter jurisdiction exists regardless of whether the parties have questioned it." *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013) (per curiam) (quoting *In re United Servs. Auto. Ass'n,* 307 S.W.3d 299, 306 (Tex. 2010) (orig. proceeding)). The requirement that a court must determine whether it has subject-matter jurisdiction applies to appellate courts just as it does to trial courts. *See Pidgeon v. Turner*, No. 15-0688, –S.W.3d–, 2017 WL 2829350, *6 (Tex. June 30, 2017); *Thai Xuan Vill. Condo. Ass'n, Inc. v. Hien Luu*, No. 14-15-00873-CV, 2016 WL 6887344, *2 (Tex. App.—Houston [14th Dist.] Nov. 22, 2016, no pet.) (mem. op.). Thus, before we can reach the merits of the trial court's challenged rulings, we first must determine whether we have jurisdiction to do so.

## A.    Finality of the Trial Court's Order Approving the Settlement

As part of Susan's first issue, she challenges the trial court's March 2, 2016 order approving the settlement—or more precisely, Legacy's sale of the judgment against Ronald—both on the merits and on the ground that the trial court lacked jurisdiction over the case.  We have appellate jurisdiction only over final judgments and over statutorily authorized interlocutory appeals.  *See Ogletree v. Matthews*, 262 S.W.3d 316, 318 n.1 (Tex. 2007).  This is not a statutorily authorized interlocutory appeal, nor do the parties contend otherwise.  We therefore lack jurisdiction to review the March 2, 2016 order unless it is a final order.

Ordinarily, there is only one final judgment in a case.  *See Ventling v. Johnson*, 466 S.W.3d 143, 149 (Tex. 2015) (citing TEX. R. CIV. P. 301).  As a rule, a judgment must dispose of all legal issues between or among all parties to be a final judgment. *See Jack B. Anglin Co. v. Tipps*, 842 S.W.3d 266, 272 (Tex. 1992) (orig. proceeding), *superseded by statute on other grounds as stated in In re Santander Consumer USA, Inc.*, 445 S.W.3d 216, 218 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding). Because Ronald's and Stacy's claims against Susan remain pending, the trial court's order approving the settlement of the Trust's judgment against Ronald does not constitute a final order by this definition.  There are, however, exceptions to the general rule that a final, appealable judgment must dispose of all issues and all parties.

As the Texas Supreme Court held in *Huston v. F.D.I.C.*, "a trial court's order that resolves a discrete issue in connection with any receivership has the same force and effect as any other final adjudication of a court, and thus, is appealable."  800 S.W.2d 845, 847 (Tex. 1990) (op. on reh'g).  Because the trial court's order approving the receiver's sale to Ronald of the Trust's judgment against him resolved this discrete issue, the order is a final, appealable judgment.  *See id.* at 848

7

(discussing the policy reasons for concluding that a trial court's approval and confirmation of a receiver's sale of property is a final appealable judgment).

In the remainder of Susan's first issue, she argues that the trial court lacked jurisdiction to render its June 2015 order removing her as trustee and appointing a receiver. Ronald states that Susan's attempted appeal of that ruling is untimely, and thus, we lack jurisdiction to review it.[1] *See Gibson v. Cuellar*, 440 S.W.3d 150, 155 (Tex. App.—Houston [14th Dist.] 2013, no pet.). However, Susan's only complaint about the June 2015 order is that the trial court lacks jurisdiction over the entire case, which is the same jurisdictional argument she makes in her timely appeal of the trial court's March 2016 order. If Susan is correct and the trial court lacked jurisdiction over the case, then all of the trial court's actions are void. Thus, if we can reach Susan's argument that the March 2016 order is void for lack of jurisdiction, then our disposition of that argument applies equally to the trial court's June 2015 order. First, however, we must address Ronald's and Legacy's remaining challenges to our own subject-matter jurisdiction.

## B. Lack of Mootness

Ronald and Legacy next contend that we lack subject-matter jurisdiction to review the order approving the settlement because the issue was rendered moot when the settlement closed. *See Matthews ex. rel. M.M. v. Kountze Indep. Sch. Dist.*, 484 S.W.3d 416, 418 (Tex. 2016) ("The mootness doctrine applies to cases in which a justiciable controversy exists between the parties at the time the case arose, but the live controversy ceases because of subsequent events."); *Kessling v. Friendswood Indep. Sch. Dist.*, 302 S.W.3d 373, 384 n.9 (Tex. App.—Houston [14th Dist.] 2009,

---

[1] Because Stacy adopted Ronald's appellate brief, she joins in the arguments we attribute to Ronald.

pet. denied) (explaining that courts lack subject-matter jurisdiction over a moot claim). Ronald further contends that because Susan's appeal of the order approving the settlement is moot, her challenge to the trial court's denial of her motion to continue the hearing on the application for approval similarly is moot.

According to Ronald, Susan's appeal of the order approving the settlement became moot when the settlement agreement closed because he conveyed to the Trust his interests in two properties, one of which has been leased to a third party. Ronald also signed a promissory note and made the first payment of the cash portion of the settlement. Finally, the receiver filed a satisfaction of judgment. These facts, however, do not indicate that the appeal is moot.[2]

An appeal is rendered moot when there ceases to be a live controversy between the parties such that appellate relief would be futile. *See Marshall v. Hous. Auth. of City of San Antonio*, 198 S.W.3d 782, 787 (Tex. 2006). The conveyance of property can moot an appeal. For example, in *Mitchell v. Turbine Resources Unlimited, Inc.*, No. 14-15-00417-CV, –S.W.3d–, 2017 WL 1181228, at *5 (Tex. App.—Houston [14th Dist.] Mar. 30, 2017, pet. filed), the appellant sought reversal of the trial court's order authorizing a receiver to sell vehicles in which the appellant claimed an ownership interest. The appeal became moot when the appellant herself sold the vehicles and thereby eliminated her claim that she owned them. *See id.*

Unlike the facts in *Mitchell*, however, the parties in this case continue to have a live controversy for which appellate relief potentially is available. The promissory note can be rescinded; money paid can be refunded; and a "satisfaction of judgment" can be set aside. *Cf. Brown v. Enter. Recovery Sys., Inc.*, No. 02-11-00436-CV, 2013

---

[2] In determining whether the appeal is moot, we have considered Legacy's affidavit concerning events that have transpired while this appeal has been pending. *See* TEX. GOV'T CODE ANN. § 22.220(c) (West Supp. 2016).

WL 4506582, *1 (Tex. App.—Fort Worth Aug. 22, 2013, pet. denied) (mem. op.) (reversing in part and remanding, despite the filing of a notice of satisfaction of judgment). As for the conveyance of real property, the settlement resulted in conveyances only from Ronald to Legacy, in its capacity as the Trust's receiver, and if Susan should prevail, these transactions can be reversed. Although Ronald implies that the property was leased after he conveyed it, the record shows that the opposite is true: the lease was effective on July 1, 2015, nearly nine months before Ronald conveyed the property.

Because the evidence before us does not indicate that anything has been done that cannot be undone, or that the parties' dispute about the settlement has ceased to be a live controversy, we conclude that Susan's appeal of the order approving the settlement is not moot.

## C.    The Denial of Susan's Motion for a Continuance

In addition to asserting the mootness argument addressed above, Ronald contends that we lack jurisdiction to review the denial of Susan's motion to continue the hearing on Legacy's application for approval of the settlement agreement because Susan (1) failed to reduce the trial court's ruling to writing, and (2) failed to list the denial of her motion for a continuance in her notice of appeal.

### 1.    Susan's Failure to Reduce the Trial Court's Ruling to Writing

Ronald contends that we lack jurisdiction to address this issue because Susan did not have the denial reduced to a written order, and he asserts that "[c]ourts dismiss for lack of jurisdiction appeals of oral orders." In support of this position, Ronald cites *Archer v. Tunnell*, No. 05-15-00459-CV, 2016 WL 519632, at *3 (Tex. App.—Dallas Feb. 9, 2016, no pet.) (mem. op.). We are not bound by *Archer*, but even if we were, we would consider Ronald's reliance on *Archer* misplaced.

10

In *Archer*, the Fifth Court of Appeals held that it lacked jurisdiction to review the denial of a summary-judgment motion and a motion to dismiss or abate. *See id.* at *2. The trial court orally denied one of the appellant's summary-judgment grounds, but did not rule, orally or in writing, on the appellant's other summary-judgment grounds or the motion to dismiss or abate. *See id.* Our sister court held that it lacked jurisdiction to review the trial court's alleged denial of the summary-judgment motion and the motion to dismiss or abate because "an interlocutory appeal may be perfected only from a written order, not an oral ruling." *Id.* at *3.

We need not decide whether we agree with the *Archer* court's reasoning, because the facts in this case are distinguishable. Here, the trial court announced on the record that it denied Susan's motion to continue the hearing on Legacy's application for approval of the settlement. The ruling was not required to be reduced to writing; the oral pronouncement was sufficient. *See Dunn v. Dunn*, 439 S.W.2d 830, 832 (Tex. 1969); *see also* TEX. R. CIV. P. 306a(2) ("Judges, attorneys and clerks are directed to *use their best efforts* to cause all judgments, decisions and orders of any kind to be reduced to writing and signed by the trial judge with the date of signing stated therein." (emphasis added)). The interlocutory ruling denying Susan's motion for continuance was merged into the written final judgment approving the settlement. *See Roccaforte v. Jefferson County*, 341 S.W.3d 919, 924 (Tex. 2011) ("The final judgment necessarily replaced the interlocutory order, which merged into the judgment . . . ."); *In re Newsome*, Nos. 14-12-01083-CV and 14-12-01084-CV, 2012 WL 6163124, at *1 (Tex. App.—Houston [14th Dist.] Dec. 11, 2012, orig. proceeding) (per curiam) (mem. op.) ("An interlocutory order is appealable when it has merged into a subsequent final, appealable order.").

## 2. *Susan's Failure to List the Denial of the Motion for Continuance in Her Notice of Appeal*

Ronald also asserts that we lack jurisdiction to review the denial of Susan's motion for continuance because it is not listed in her notice of appeal. This argument is contrary to the Texas Rules of Appellate Procedure and to binding precedent from both the Texas Supreme Court and our own court.

A party is not required to describe in a notice of appeal each interlocutory ruling to be challenged in the appellate court, but need only "state the date of the judgment or order appealed from." *See* TEX. R. APP. P. 25.1(d)(2); *see also Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) ("We initially note that the shareholders were not required to state in their notice of appeal that they were challenging the interlocutory order granting special exceptions. They were required only to state the date of the judgment or order appealed from—in this instance the order dismissing their suit."); *Valls v. Johanson & Fairless, L.L.P.*, 314 S.W.3d 624, 631 n.7 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("A notice of appeal need not identify every adverse interlocutory ruling the appellant intends to challenge; instead, the notice must state only the date of the judgment or order from which he appeals—in this case, the order granting summary judgment.").

Because Susan complied with Texas Rule of Appellate Procedure 25.1(d)(2) by stating in her notice of appeal her intent to appeal the trial court's final order signed on March 2, 2016, she invoked our jurisdiction not only to review that order but also to address interlocutory rulings that were merged into it.

In sum, we have jurisdiction to consider Susan's appeal of the trial court's written order granting Legacy's application for approval of the settlement agreement and the trial court's oral ruling denying Susan's motion for a continuance of the hearing on that application. We now turn to Susan's first issue, in which she argues

12

that the statutory probate court's order approving the settlement agreement is void because the trial court lacked jurisdiction over the case.

## IV. THE STATUTORY PROBATE COURT'S JURISDICTION

The existence of subject-matter jurisdiction is a question of law, which we review de novo. *See Rhule*, 417 S.W.3d at 442. Susan's argument that the trial court lacked jurisdiction turns on a question of statutory construction, which likewise presents a question of law subject to de novo review. *See In re M.G.N.*, 441 S.W.3d 246, 248 (Tex. 2014) (per curiam).

Susan contends that the statutory probate court lacked jurisdiction over these proceedings because the pleadings show that Ronald and Stacy sued to remove Susan as trustee and hold her liable for breach of fiduciary. Citing section 115.001 of the Texas Trust Code, she argues that the district court has original, exclusive jurisdiction over all proceedings to remove a trustee or to determine a trustee's liability. *See* TEX. PROP. CODE ANN. § 115.001(a)(3) (West 2014) (district court's jurisdiction over actions to appoint or remove a trustee); *id.* § 115.001 (a)(4) (district court's jurisdiction over actions to determine a trustee's "powers, responsibilities, duties, and liability"). Susan acknowledges that statutory probate courts have concurrent jurisdiction with district courts over actions by or against a trustee and actions involving testamentary trusts, *see* TEX. EST. CODE ANN. § 32.007(2), (3) (West 2014), but she maintains that a statutory probate court can exercise that jurisdiction only when a probate proceeding is actually pending. She contends that no probate proceeding was pending when the statutory probate court granted Legacy's application to approve the Trust's settlement agreement with Ronald, and thus, the order is void for lack of jurisdiction. Our review of the legislative framework for a statutory probate court's jurisdiction shows that the court's trust jurisdiction is independent of its probate jurisdiction.

13

We begin, as Susan does, with section 115.001 of the Texas Trust Code. Although Susan is correct in stating that section 115.001 gives a district court original, exclusive jurisdiction over proceedings to remove a trustee or to determine a trustee's liability, section 115.001 also provides that statutory probate courts are an exception to this general rule. Section 115.001(a) states, "*Except as provided by Subsection (d) of this section*, a district court has original and exclusive jurisdiction over all proceedings by or against a trustee and all proceedings concerning trusts . . . ." (emphasis added). Turning to subsection (d), we note the provision reads, "[t]he jurisdiction of the district court is exclusive *except for jurisdiction conferred by law on . . . a statutory probate court . . . .*" *Id.* § 115.001(d)(1) (emphasis added). The trial court in this case was Harris County Probate Court No. 2, which is a statutory probate court. *See* TEX. GOV'T CODE ANN. § 25.1031 (West Supp. 2016). Thus, if the law confers jurisdiction on a statutory probate court to hear actions against a trustee or actions involving testamentary trusts, then Harris County Probate Court No. 2 had jurisdiction over the case.

In section 32.006 of the Texas Estates Code, the legislature expressly conferred on statutory probate courts the jurisdiction to hear actions involving testamentary trusts and actions in which a trustee is a party:

> In a county in which there is a statutory probate court, the statutory probate court has jurisdiction of:
> (1) an action by or against a trustee;
> (2) an action involving an inter vivos trust, testamentary trust, or charitable trust . . . .

TEX. EST. CODE ANN. § 32.006 (West 2014). *See also id.* § 32.007 (stating that a statutory probate court and a district court have concurrent jurisdiction over such actions). Thus, under the unambiguous language of these statutes, Harris County Probate Court No. 2 had jurisdiction over this suit.

14

Susan nevertheless contends a statutory probate court's jurisdiction over trust matters "is limited." As support for this proposition, she relies on Texas Estates Code section 32.001:

> (a) All probate proceedings must be filed and heard in a court exercising original probate jurisdiction. The court exercising original probate jurisdiction *also* has jurisdiction of all matters related to the probate proceeding as specified in Section 31.002 for that type of court.
>
> (b) A probate court may exercise *pendent and ancillary jurisdiction* as necessary to promote judicial efficiency and economy. . . .

*Id.* § 32.001(a), (b) (emphasis added). Section 31.002, referenced above, describes the types of actions constituting "a matter relating to a probate proceeding," and those actions differ depending on whether the court exercising jurisdiction is a statutory probate court, a county court at law exercising original probate jurisdiction, or neither. *See id.* § 31.002. Regarding a statutory probate court, which is the "type of court" at issue here, section 31.002 provides that "a matter related to a probate proceeding" includes the "administration of a testamentary trust if the will creating the trust has been admitted to probate in the court." *See id.* § 31.002(b)(2), (c)(1).

A plain reading of these sections reveals that they do not limit a probate court's jurisdiction. To the contrary, section 32.001 expands the jurisdiction of a court that is exercising original probate jurisdiction over a probate proceeding, so that the same court in which the probate proceeding is pending also has jurisdiction over matters related to the probate proceeding. But, if no probate proceeding is pending, then section 32.001 (with its incorporation of section 31.002) does not apply.

Susan contends that the probate proceeding concerning her mother's estate closed many years ago, and although we assume, without deciding, that Susan is correct, the absence of a pending probate proceeding does not deprive a statutory

15

probate court of its independent jurisdiction over testamentary-trust actions. In actions concerning testamentary trusts, the statute's text does not limit the statutory probate court's jurisdiction. *See id.* § 32.006.

Our conclusion that a statutory probate court has jurisdiction over "an action involving an inter vivos trust, testamentary trust, or charitable trust" as unambiguously stated in Texas Estates Code section 32.006, is unaffected by the authorities Susan cites concerning proceedings "appertaining to or incident to an estate." The authorities on which Susan relies deal with the conditions in which a court exercising original probate jurisdiction can exercise jurisdiction over related or ancillary matters; they do not address a statutory probate court's independent jurisdiction over trust actions.[3] Indeed, Susan herself maintains that the case before us is not a proceeding "appertaining to or incident to an estate"; thus, her reliance on

---

[3] *See, e.g.*, TEX. EST. CODE ANN. § 36.001 (defining the term "probate proceeding"); *Valdez v. Hollenbeck*, 465 S.W.3d 217, 224 n.8 (Tex. 2015) (explaining that "[t]he heirs initially filed their lawsuit in the original probate proceeding as a suit appertaining and incident to a probate estate under [the predecessor statute] section 5A of the Probate Code," under which "a probate proceeding must be pending for a probate court to exercise jurisdiction over matters related to that proceeding"); *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 506 (Tex. 2010) (holding that a probate court lacked jurisdiction over a proceeding to declare heirship because a "court empowered with probate jurisdiction may only exercise its *probate* jurisdiction over matters incident to an estate when a probate proceeding related to such matters is already pending in that court" (emphasis added) (quoting *Bailey v. Cherokee Cty. Appraisal Dist.*, 862 S.W.2d 581, 585 (Tex. 1993))); *In re John G. & Marie Stella Kenedy Mem'l Found.*, 315 S.W.3d 519, 522 (Tex. 2010) (orig. proceeding) (quoting the same language from *Bailey*); *Goodman v. Summit at W. Rim, Ltd.*, 952 S.W.2d 930, 933 (Tex. App.—Austin 1997, no pet.) (citing *Bailey*); *In re Estate of Hanau*, 806 S.W.2d 900, 904 (Tex. App.—Corpus Christi 1991, writ denied) ("The trial court has power to hear all matters *incident to an estate* only in those instances where a probate proceeding, such as the administration of an estate, is actually pending in the court in which the suit is filed, relating to a matter incident to that estate." (emphasis added) (citing *Interfirst Bank–Hous. v. Quintana Petroleum Corp.*, 669 S.W.2d 864, 873 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.))); *Pullen v. Swanson*, 667 S.W.2d 359, 363 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (stating that a statutory probate court's jurisdiction "to hear all matters *incident to an estate* necessarily presupposes that a probate proceeding is already pending in that court" (emphasis added)).

case law addressing a statutory probate court's jurisdiction over proceedings "appertaining to or incident to an estate" is misplaced.

We overrule Susan's first issue.

## V. CHALLENGE TO THE MERITS OF THE ORDER APPROVING THE SETTLEMENT

In an appeal from a trial court's grant of a receiver's application for approval of a settlement, we review the ruling for abuse of discretion. *See Ace Prop. & Cas. Ins. Co. v. Prime Tempus, Inc.*, No. 03-06-00236-CV, 2009 WL 2902713, at \*2 (Tex. App.—Austin Aug. 26, 2009, no pet.) (mem. op.). The challenged ruling constitutes an abuse of discretion if it was made arbitrarily, unreasonably, or without reference to any guiding rules and principles. *See Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 911 (Tex. 2017). A trial court does not abuse its discretion if it based its decision on conflicting evidence, some of which supports its decision. *See Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) (per curiam). On the other hand, the trial court abuses its discretion if its ruling is contrary to the only permissible view of the probative, properly admitted evidence. *Id.*

### A. The Incomplete Record

Before reaching the merits of the argument, we must settle an issue Ronald raises concerning the state of the reporter's record. According to Ronald, the reporter's record before us is incomplete, and we therefore must presume that the omitted material supports the trial court's ruling and summarily affirm. *See In re J.A.T.*, 502 S.W.3d 834, 836 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("[I]n the absence of an agreement between the parties or a statement of the appellant's issues to be presented on appeal, 'we must presume that the omitted portions of the record are relevant and would support the judgment.'" (quoting *Mason v. Our Lady*

17

*Star of the Sea Catholic Church*, 154 S.W.3d 816, 822 (Tex. App.—Houston [14th Dist.] 2005, no pet.))).

Ronald contends that the reporter's record is incomplete because Susan did not ask that the court reporter include in the appellate record a transcript of a hearing that took place on June 18, 2015. Ronald maintains that a transcript of that proceeding was necessary because during the March 2, 2016 hearing on the application to approve the settlement, his attorney said, "I'll ask the Court to take judicial notice of the proceeding in this Court on June 18, 2015 and the evidence that was offered," and the trial court responded, "So noted." Because a transcript of that proceeding is not in the record, Ronald argues that we must presume the evidence offered during the June 18, 2015 hearing is relevant and supports the judgment. Although Susan filed a reply brief after Ronald pointed out this omission, she did not respond to this argument.

We agree that the presumption applies. *See id.* But, even if it did not, we still would conclude that the record before us supports the trial court's approval of the settlement agreement.

## B.     The Terms of the Settlement Agreement

At the hearing, the parties agreed that as of February 26, 2002, the amount of the outstanding judgment and post-judgment interest Ronald owed the Trust was $6,128,326.99, and that if interest had continued to accrue without interruption up to the time of the hearing, the amount of Ronald's outstanding debt would have been about $24 million. It is undisputed, however, that Ronald paid the Trust $8 million in the summer of 2015, so that the $24 million figure overstates the amount owed by

at least 50%.[4] The value that the Trust received in exchange for the judgment against Ronald included (1) money; (2) interests in real property; (3) the release of various claims; and (4) Ronald's execution of an "Agreement Respecting Certain Prospective Real Estate Acquisitions" and an "Agreement Respecting Conduct of the Litigation."

### 1. The Monetary Part of the Settlement Agreement

Ronald agreed to pay the Trust $4 million at 4% interest over two years. As Susan admits in her brief, Ronald made the first payment 90 days before it was due.

### 2. Conveyance of Ronald's Interests in Real Property

The settlement agreement called for Ronald to convey to the Trust his undivided 25% interest in two properties, River Bend Farm and Cap Rock Ranch.

River Bend Farm's appraised value is $3.5 million, and Naumes testified that Ronald's interest in the property could be worth as much as a million dollars. Although Susan asserts that the conveyance of Ronald's interest in River Bend Farm "was of little or no value because the Trust already owned the interest," she does not support this statement. The evidence instead shows that Susan and Ronald each owned an undivided 25% interest in the farm, and the Trust owned the remaining undivided 50% interest. While Susan was trustee, the taxes on the property became delinquent, and the taxing authorities sued Susan, individually and in her capacity as trustee of the Trust, and Ronald. No one answered the suit, and the taxing authorities foreclosed on Ronald's interest to satisfy the default judgment against him for $11,334.63. After the sale, Susan, in her capacity as trustee, redeemed it,

---

[4] Because post-judgment interest compounds annually, one cannot arrive at the total amount owed simply by subtracting from $24 million the amounts that have been paid or that otherwise should have been credited. *See* TEX. FIN. CODE ANN. § 304.006 (West 2016).

and the Trust received the excess proceeds from the sale. At the hearing for approval of the settlement agreement, Ronald's counsel stated, "When you redeem the property of a co-tenant under the Texas statute, you restore the title to the parties prior to the tax sale." The trial court responded, "I know the law. That's a correct statement of it."[5] Although Susan states in her brief that "[t]he legal effect of the redemption by the Trust of Ronald's 25% in the River Bend Farm is in dispute," she presents no grounds for disputing the trial court's implied finding that Ronald owned a 25% undivided interest in the property at the time of the settlement agreement.

The settlement agreement also requires Ronald to convey to the Trust his undivided 25% interest in the 6,431-acre Cap Rock Ranch. Legacy had Cap Rock Ranch appraised during the settlement negotiations, but did not state its appraised value on the record.

### 3. Released Claims

A third component of Ronald's consideration for his purchase of the Trust's judgment against him concerned the release of the following claims against the Trust.

> **(a) Claims for damages, interest, or other expenses due to the untimely distribution of his share of the Trust's net income actually collected before December 31, 2013**

Ronald's claims against the Trust for damages due to the delay in distributing his share of the Trust's net income include at least two elements.

---

[5] *See Poenisch v. Quarnstrom*, 361 S.W.2d 367, 372 (Tex. 1962) ("The general rule is that when a cotenant redeems property from a tax foreclosure sale, such action is considered as being for the benefit of all co-owners. . . . . The redemption of the property could at most give rise to some claim for contribution . . . . (citations omitted)).

20

The first element is represented by the taxes that Ronald was required to pay on income that was attributed to him, but not paid. According to the evidence presented at the hearing, Susan, in her capacity as trustee, reported that the Trust made distributions to Ronald, when in fact, he received nothing. Ronald nevertheless was required to pay taxes on the income attributed to him. Naumes stated at the hearing that he believed the amount Ronald paid was under $500,000.

The second element of the claim consists of damages from delayed distributions of income that should have been made to Ronald, but that were not reported even as fictitious distributions. According to Naumes, this component of the claim could run into the millions of dollars. The amount cannot be definitely ascertained because Susan—in violation of a court order—has refused to provide Trust records. There is, however, some circumstantial evidence. For example, records that Legacy has been able to obtain from financial institutions show that while Susan was trustee she made distributions to herself and her daughter of at least $2.3 million, but made no distributions to Ronald or his daughter. Susan and Ronald hold identical interests in Trust income, as do Stacy and Gibson, so if Susan were entitled to distributions, then Ronald would have been entitled to distributions at the same time and in the same amount.

Due to Susan's refusal to cooperate in reconstructing fourteen years' worth of Trust financial information, Naumes estimates the costs of forensic accounting and legal fees to definitively determine the amount due to Ronald would run into the millions. This is supported by the $3 million in trial-level legal fees incurred by the parties in *Lee I* and the further $800,000 in legal fees assessed by the trial court in the event of an appeal.[6] Moreover, Naumes testified that in the years since *Lee I* was

---

[6] *See Lee I*, 47 S.W.3d at 775, 797.

21

tried, both the rates charged by the attorneys and the number of attorneys involved in this litigation have increased.

**(b)** **Claims regarding the calculation of the Judgment and interest**

Ronald claims that the post-judgment interest of "the Judgment" (defined in the settlement agreement as the 1996 judgment in *Lee I*, as modified by the 2001 decision in the appeal of that case and reflected in the appellate court's 2002 mandate and in the trial court's 2012 order reviving the dormant judgment) has been calculated incorrectly. The record shows that in 2002, Ronald contacted Susan's attorney Zabel with a plan to pay the judgment in full by assigning to the Trust (1) his interests in the same two properties he conveyed as part of the settlement agreement; and (2) his beneficial interest in income distributions from the Trust until the judgment was satisfied. Ronald's counsel believed that the distributions due to Ronald upon the sale of the properties would substantially satisfy the judgment, but if a balance remained after the sale, the difference would be satisfied by cash loaned from Stacy's separate trust. Neither Zabel nor Susan ever responded. Ronald claims that, given his offer to temporarily assign his interest in income distributions to the Trust, and the Trust's failure to distribute any income to him, the accrual of post-judgment interest should have been suspended, or at least reduced by the amount of income that should have been distributed to him. Naumes testified that settling such claims would be more beneficial to the Trust than incurring the costs of litigating them.

**(c)** **Claims related to the allocation of Trust receipts and expenses between principal and income prior to December 31, 2013**

Ronald was entitled to distributions of the Trust's current net income, and he claims Susan reduced the Trust's net income by the way in which she allocated Trust

22

receipts and expenses between principal and income. This is another area in which Naumes was concerned about the costs to the Trust of accurately reconstructing its financial history during the time Susan was the trustee. According to Naumes, "[W]e would do forensic accounting for the rest of our lives to determine whether or not the allocation of principal [and] income was right."

### (d) Claims for trustee's fees and Trust expenses due to Ronald, or incurred and paid by him, before June 30, 2015

Naumes testified that Ronald paid for all of a property's costs while he owned an interest in it; however, no evidence was introduced about the amount of those costs.[7]

### (e) Additional released claims

There is less evidence about other claims that Ronald released as part of the settlement agreement. These additional claims, some of which appear to duplicate claims already mentioned, are as follows:

- Claims for payment of income from revenue collected by the Trust before December 31, 2014, to the extent that amounts payable for his health, maintenance, and support exceeded his one-third share of the Trust's net income;

- Claims for attorney's fees Ronald incurred before June 30, 2015, to the extent that such claims had not already been reimbursed by Legacy;

- Claims for attorney's fees Ronald incurred in connection with the settlement agreement or the Judgment;

- Claims that the Judgment is dormant or unenforceable;

- Claims to equitably reform the Judgment based on the inequitable or improper accrual of interest; and

---

[7] From the tax suit, we also know that Ronald did not always timely pay the taxes on his interest in River Bend Farm.

23

- Claims "for damages suffered on account of [Ronald's undivided 25% interest] in River Bend Farm."

### 4. *Additional Agreements*

The settlement also included two additional agreements.

In the "Agreement Respecting Certain Prospective Real Estate Acquisitions," Ronald agreed to the Trust's proposed purchase of Susan's undivided 25% interests in the Cap Rock Ranch and Rim Rock Ranch properties for not more than $3.4 million, and to the Trust's proposed purchase of Susan's undivided 25% share of the River Bend Farm for a price not to exceed its appraised value. Naumes explained that obtaining Ronald's approval of these proposed purchases was intended to eliminate the risk of suit if Legacy converted "an earning asset into what may become an un-earning asset." Naumes also stated that it would be of great value to the Trust if Legacy could unite the undivided interests in the property, and that the Trust would benefit if Ronald were not able to "blackball" those acquisitions. There is no evidence about whether Susan would agree to sell her share of the properties to the Trust.

In the "Agreement Respecting Conduct of the Litigation" in this case, Legacy, Ronald, and Stacy agreed that at least a portion of Ronald's and Stacy's claims against Susan would benefit the Trust. To avoid duplicating their efforts and multiplying its own attorney's fees, Legacy agreed that (a) Ronald's counsel would take the lead in pursuing those claims; (b) Stacy's counsel would take secondary responsibility for pursuing their claims while avoiding duplication of the work of Ronald's counsel; (c) Legacy would reimburse Ronald $500,000 and Stacy $100,000 for their reasonable and necessary attorney's fees and litigation expenses; and (d) if Ronald or Stacy believe that additional reasonable and necessary attorney's fees and litigation expenses should be incurred, then that person can

24

request advance approval for the additional expenditures, which approval Legacy will not unreasonably withhold. In return, Ronald and Stacy agreed that Legacy was not obliged to them to prosecute the Trust's claims against Susan for breaches of her obligations to the Trust while serving as its trustee.[8]

## C. Ronald's and Legacy's Evaluation of the Settlement Agreement

According to Naumes, Legacy believes that the settlement is in the best interest of the Trust and the Trust's four beneficiaries, and is "absolutely" a better deal for the Trust than attempting to collect the full amount of the judgment and accrued interest in an adversarial proceeding. Naumes testified that in evaluating the settlement, Legacy did not assign specific dollar values to each of Ronald's claims, but instead evaluated the settlement agreement as a whole and concluded that the exchange was fair and equitable. Naumes further stated that after reviewing Ronald's tax returns and extensively interviewing him about his assets, holdings, separate property, and community property, Naumes believes that the settlement represents the most that Legacy can expect to obtain from Ronald. Ronald similarly testified that the full amount of the Trust's judgment against him, including post-judgment interest, exceeds his net worth.

## D. Susan's Arguments on the Merits of the Settlement Agreement

Susan contends that the trial court abused its discretion in approving the settlement because the trial court (a) applied the wrong standard by relying "on its own view of continued litigation," (b) lacked sufficient evidence to determine the merits of Ronald's released claims or of the Trust's best interests, and (c) approved

---

[8] As previously mentioned, the trial court authorized Legacy to sue to recover Trust assets or to recover damages suffered by the Trust, "provided, however, that the Receiver shall have discretion not to pursue litigation against [Susan] that is undertaken by beneficiaries of the Trust for the benefit of the Trust."

the settlement for only half of the judgment's value without determining the merits of the claims Ronald released. We examine each of these arguments in turn.

### 1.    The Trial Court's Reliance "Upon Its Own View of Continued Litigation"

Susan argues that the trial court "abused its discretion by approving the settlement based upon its own view of continued litigation." In support of this argument, Susan relies on *Webre v. Black*, 458 S.W.3d 113 (Tex. App.—Houston [1st Dist.] 2015, no pet.). In that case, the First Court of Appeals reversed a trial court's approval of a settlement between the court-appointed guardian of a ward's estate and the ward's former attorney-in-fact, who allegedly had engaged in transactions that were presumptively unfair to the estate. *See id.* at 118–19. The trial court approved the settlement based on the stated view that it was not in the interest of the 87-year-old incompetent ward to continue litigating a dispute that would not personally benefit the ward, regardless of whether the litigation would benefit the ward's estate. *See id.* at 114, 116–18. The appellate court reversed because the trial court was required by statute to consider whether the settlement was in the best interest of the ward's estate, but instead excluded evidence on that issue and considered only whether the settlement was in the best interest of the ward himself. *See id.* at 119–20 (citing former TEX. PROB. CODE § 774(a)(4)).

*Webre* is distinguishable from the case at hand. Here, the trial court excluded no evidence, and there is no evidence that the trial court failed to consider whether the settlement was in the best interests of the Trust or its beneficiaries.

We also disagree with Susan's implication that avoiding the costs of litigation can never be a valid consideration in evaluating a settlement agreement. Here, the evidence presented at the hearing showed that, in light of Susan's stonewalling of efforts to reconstruct the Trust's financial history, attempting to exactly quantify the

amount that Ronald owes would increase the Trust's expenses, which would reduce its current net income to the prejudice of all of its beneficiaries. While the delay in litigating that issue could allow post-judgment interest to continue accruing at Ronald's expense, neither the Trust nor its beneficiaries would benefit from such delay if—as Ronald and Naumes testified—the full amount of post-judgment that has accrued (if no credits are applied toward it) already exceeds Ronald's net worth.

### 2. *The Sufficiency of the Evidence on Which to Decide Whether the Settlement Is in the Trust's Best Interest*

Susan next contends that the trial court lacked sufficient evidence on which to exercise its discretion. We disagree. Although we will not repeat our summary of the major points of the evidence drawn from our review of the approximately 600-page reporter's record, we are confident that the information we have summarized was sufficient to allow the trial court to evaluate the settlement agreement.

In arguing that this evidence was inadequate to permit the trial court to evaluate the settlement agreement, Susan relies on *In re Rains*, 473 S.W.3d 461 (Tex. App.—Amarillo 2015, no pet.). *Rains* concerned a settlement under the Structured Settlement Protection Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 141.001–.007. The Act requires a factoring company to obtain court approval before it can purchase a person's right to receive tax-free payments of a structured settlement. *See id.* § 141.004. No such purchase is at issue here.

Susan nevertheless contends that the factors the *Rains* court considered in reviewing a trial court's approval of the transfer of structured-settlement payment rights applies by analogy to our review of the trial court's ruling approving the settlement at issue here. But, even in the context of the Structured Settlement Protection Act, we expressly declined to follow *Rains* because its eighteen-factor analysis "take[s] the court's analysis well beyond the scope of the inquiry

authorized." *Metro. Life Ins. Co. v. Structured Asset Funding, LLC*, 501 S.W.3d 706, 720 (Tex. App.—Houston [14th Dist.] 2016, no pet.). That conclusion applies with even more force here, where some of the factors considered in *Rains* are plainly inapplicable. For example, it is not possible to consider the Trust's "future yet reasonably foreseeable domestic, economic, physical, medical, and educational needs," its "age, education, and acumen," or its "business or financial acumen." *See Rains*, 473 S.W.3d at 464.

### 3. The Trial Court's Failure to Determine the Merits of Ronald's Released Claims

In her last challenge to the merits of the trial court's decision, Susan contends that the trial court failed to determine the merits of Ronald's released claims and that the court approved the settlement of the judgment against Ronald "for only one-half its value." Some of the problems with these arguments are self-evident.

First, to obtain a trial court's determination of the merits of a claim is to litigate that claim, which is the very object that a settlement is intended to avoid. The record nevertheless is sufficient to allow the trial court to conclude that the Trust had net income that should have been distributed to Ronald while Susan was trustee, and that if the issue were litigated, Ronald's debt to the Trust would be offset to some degree by the Trust's debt to Ronald. The delay required to determine the extent of the offset (1) would prejudice Ronald because post-judgment interest of 10% per annum, compounded annually, would continue to accrue during that time;[9] and (2) would not benefit the Trust, because even if Ronald were entitled to no offset, he still could not pay the full amount of the judgment. Naumes not only testified that

---

[9] *See* TEX. FIN. CODE ANN. § 304.006. The post-judgment interest Ronald owed to the Trust would outstrip the pre-judgment interest accruing on any debt that the Trust owed to him, because pre-judgment does not compound. *See id.* § 304.104.

Ronald does not have the financial ability to pay the judgment, but also stated, "I don't believe that I could have gotten another nickel out of him." Obtaining a release of the claims, however, saves the Trust the expense of litigating them.

Second, the trial court does not have a "line-item veto" of the claims released in the settlement agreement, but must approve or reject the settlement agreement as a whole. Moreover, even if some of Ronald's claims are valueless, the Trust is not harmed by their release.

Third, although Susan characterizes the settlement as a sale of the judgment against Ronald for less than half of its value, this is not supported by the record. The Trust received an $8 million payment; an additional $4 million payable over two years; the conveyance of a 25% interest in a property appraised for $3.5 million, and for which Ronald's share may be worth as much as $1 million; and the release of a claim for around $500,000 for taxes he was required to pay on income previously attributed to him but which he never received. Based on Susan's distributions to herself and her daughter of about $2.3 million and the fact that both Susan and Ronald each are entitled to a distribution of the 1/6th of the Trust's current net income, Ronald also may be entitled to delay damages from past-due multi-million-dollar distributions. These amounts total more than $15 million, which is considerably more than half of the value of the Trust's judgment against Ronald. Moreover, the judgment's post-judgment interest is compounded annually, so if any of the amounts that the Trust owed Ronald should have been credited against the accrual of post-judgment interest, then those amounts would further reduce the amount of post-judgment interest that continued to compound. Consequently, the value of the Trust's judgment against Ronald after any offsets cannot be precisely determined without knowing what amounts should have been distributed, and when Ronald should have been paid. Thus, the inability to more exactly quantify the value

29

of Ronald's released claims is due in part to Susan's failure to provide Legacy with the Trust's financial information as she was ordered to do.

On this record, we cannot say that the trial court abused its discretion in approving the settlement. We overrule Susan's second issue.

## VI. DENIAL OF SUSAN'S MOTION FOR A CONTINUANCE

When a party moves for a continuance to conduct discovery, we review the denial of the motion for a clear abuse of discretion. *See Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004). The Texas Rules of Civil Procedure specify that no motion for a continuance shall be granted "except for sufficient cause supported by affidavit, or by consent of the parties, or by operation of law. TEX. R. CIV. P. 251. When reviewing the ruling on the merits, some of the factors we consider include "the length of time the case has been on file, the materiality and purpose of the discovery sought, and whether the party seeking the continuance has exercised due diligence to obtain the discovery sought." *See id.* First, however, the record must show that the complainant complied with the rules governing a motion for continuance. *See Brown v. Gage*, 519 S.W.2d 190, 192 (Tex. Civ. App.—Fort Worth 1975, no writ).

If a first motion for continuance is sought to obtain testimony, then

> [the movant] shall make affidavit that such testimony is material, showing the materiality thereof, and that he has used due diligence to procure such testimony, stating such diligence, and the cause of failure, if known; . . . and, if it be for the absence of a witness, he shall state the name and residence of the witness, and what he expects to prove by him; and also state that the continuance is not sought for delay only, but that justice may be done . . . .

TEX. R. CIV. P. 252.

30

Susan's motion did not meet these requirements. She asked for a continuance of "at least 90 days" to "conduct discovery to determine" the following:

(i)    Legacy's valuation of the Judgment;

(ii)    what, if any, credits Ronald Lee claims he is entitled to;

(iii)    Ronald Lee's ability to pay the Judgment in full;

(iv)    what, if any, other consideration Ronald Lee is providing under the terms of the settlement;

(v)    what claims are the subject of the releases given by Ronald Lee to Legacy under the settlement; and

(vi)    why the settlement is in the best interest of the Trust as alleged by Legacy.

Susan attached to the motion only the verification of her attorney Daniel J. Sheehan, who attested that he had read the motion and that the statements it contained were true and correct.

Susan did not identify in her motion the discovery she planned to conduct, or indeed, why discovery was necessary at all. All of the information she identified in her motion was either incorporated in Legacy's application for approval of the settlement or was presented at the hearing. At the close of the evidence, the trial court asked Sheehan what discovery Susan needed and whom the attorney wished to depose. Sheehan responded, "[O]bviously, we have a pretty good record on Mr. Naumes. But I think that Tom Zabel should have an opportunity to testify in some capacity." Zabel, however, is one of Susan's attorneys. As her agent, not only is he subject to Susan's control, but he also was served with Legacy's application for approval of the settlement agreement. If his testimony was wanted, he had only to attend the hearing, without need of a continuance.

We overrule this issue.

31

## VII. CONCLUSION

The statutory probate court properly exercised its trust jurisdiction over this suit, and thus, none of its challenged orders are void for lack of jurisdiction. Moreover, the record does not show that the trial court abused its discretion in approving the Trust's receiver's application for approval of its settlement agreement with Ronald Lee Jr. or in denying Susan Lee's motion for a continuance.

We affirm the trial court's judgment.


/s/     Tracy Christopher
Justice


Panel consists of Chief Justice Frost and Justices Christopher and Donovan.